# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| QUEST DIAGNOSTICS INCORPORATED, | Civil Action No. _____ |
| Plaintiff, | |
| v. | |
| NATIONAL ASSET MANAGEMENT, LLC (a/k/a NATIONAL ACCOUNT MANAGEMENT, LLC), EIGHTFOLD INC., and RICKARD BRIGGS, | **VERIFIED COMPLAINT** |
| Defendant. | |

Plaintiff QUEST DIAGNOSTICS INCORPORATED ("Quest"), by and through its attorneys, DLA Piper LLP (US), and against Defendants, NATIONAL ASSET MANAGEMENT, LLC, also known as NATIONAL ACCOUNT MANAGEMENT, LLC, (collectively, "NAM"), EIGHTFOLD INC. ("Eightfold"), and RICKARD BRIGGS ("Briggs") alleges as follows:

## Introduction

1.     Since 2007, NAM has provided Quest with debt collection services pursuant to a Services Agreement.  On or about January 1, 2014, without warning and without a contractual right to do so, NAM advised Quest that it was unilaterally terminating the Services Agreement, that it was holding amounts collected on behalf of Quest in escrow, and that it would no longer continue to collect payments on behalf of Quest.  Despite Quest's repeated attempts to communicate with representatives at NAM via telephone, electronic mail and letters, NAM has intentionally and willfully avoided providing Quest with any information about the termination or Quest's accounts.  NAM currently has access to approximately $90 million worth of Quest's receivables.  By this action, Quest seeks a preliminary injunction regarding NAM's wrongful

termination of the parties' agreement and a constructive trust in connection with Defendants' wrongful retention of Quest's assets.

2.     Further, upon information and belief, NAM's assets and liabilities are wholly owned and/or are being held by Eightfold and/or Briggs, including amounts that rightfully belong to Quest.  Put simply, Defendants NAM, Eightfold and/or Briggs are holding Quest's assets hostage until Quest pays some amount that NAM alleges it is owed.  There is a great danger the assets are being dissipated as Defendants have not indicated that they will return the assets upon a reconciliation, some payment, or other unarticulated circumstances.

3.     Specifically, Quest seeks preliminary injunctive relief enjoining Defendants from performing any further commercial activity on behalf of Quest, including, but not limited to, receiving payments on behalf of Quest; imposing a constructive trust on assets held by Defendants; requiring Defendants to provide an accounting of the assets it is holding; and ordering that Defendants immediately transfer all assets back to Quest.  Quest requires this relief because NAM has notified Quest that it is no longer in business and upon information and belief, Quest's assets and accounts are at risk of dissipation.

## Parties

4.     Plaintiff Quest is a Delaware corporation with its principal place of business located in Madison, New Jersey.

5.     Defendant NAM is a Pennsylvania limited liability corporation with its principal place of business located in Moon Township, Pennsylvania and is a wholly owned subsidiary of Eightfold.  Upon information and belief, NAM operates under both the names National Asset Management, LLC and National Account Management, LLC.

6.     Defendant Eightfold is a Pennsylvania corporation with its principal place of business located in Moon Township, Pennsylvania.

7.     Defendant Briggs is a Pennsylvania resident and is an officer and/or owner of both NAM and Eightfold.

8.     NAM is no longer operating as a business and, upon information and belief, its assets and liabilities are wholly owned by Eightfold and/or Briggs.

9.     Upon information and belief, Briggs and Eightfold are inexorably intertwined with NAM.

10.    Upon information and belief, NAM and Eightfold use the same business address.

11.    Upon information and belief, Briggs and Eightfold derived substantial pecuniary benefit from the relationship between Quest and NAM.

12.    Upon information and belief, Briggs and Eightfold failed to observe corporate formalities for NAM.

13.    Upon information and belief, NAM is the alter ego of Eightfold.

### Jurisdiction and Venue

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) based on Quest's citizenship in the State of New Jersey and Defendants' citizenship in the State of Pennsylvania, and the matter in controversy is in excess of $75,000, exclusive of interest and costs.

15.    The Court has personal jurisdiction over Defendants because they have continuous and systematic contacts with the State of New Jersey. Moreover, they have directed their activities at a resident of the State of New Jersey, the damages alleged herein arise from and/or are related to Defendants' activities, and maintenance of the suit comports with traditional notions of fair play and substantial justice. Last, in the Services Agreement, NAM agreed to submit to the jurisdiction of the federal and state courts located in New Jersey.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district.

### The Services Agreement

17.     On November 2, 2007, Quest and NAM entered into a Services Agreement by which NAM agreed to perform certain debt collection services on behalf of Quest. A true and correct copy of the Services Agreement is hereby attached as Exhibit A.

18.     The initial contract period for the Services Agreement was thirty-six months. However, effective November 1, 2010, the Services Agreement was amended to run for an additional thirty-six month period. A true and correct copy of the Amendment to Services Agreement with an effective date of November 1, 2010 is hereby attached as Exhibit B.

19.     In October 2013, an additional amendment to the Services Agreement was executed by the parties with an effective date of November 1, 2013, and running until February 28, 2014. A true and correct copy of the Amendment Two to Services Agreement with an effective date of November 1, 2013 is hereby attached as Exhibit C.

20.     In Section 2.2, the Services Agreement provides that the agreement may be terminated as follows:

> (a) For Cause. If either party breaches a material term of this Agreement, the non-breaching party may terminate the Agreement upon giving the breaching party ten days' advance written notice of the non-breaching party's decision to terminate this Agreement if the breach is not cured within that ten-day period. If, during this ten-day period, the breaching party cures the breach or makes substantial progress towards curing the breach, this Agreement will remain in effect.

> (b) For Convenience.   Quest Diagnostics may terminate this Agreement at any time, without cause, upon thirty days' advance written notice to [NAM]. If Quest Diagnostics' termination is not the result of a breach by Agency, Quest Diagnostics agrees to compensate Agency for any work already approved and performed

prior to the date of termination, so long as Agency agrees to stop all work to the extent specified in the notice of termination.

21.     Section 2.3 of the Services Agreement provides:

*Transition Assistance Services Upon Termination.*  If either party terminates this Agreement for any reason and Quest Diagnostics requests Transition Assistance Services, Agency will provide Transition Assistance Services for up to ninety days, or as agreed between the parties. "Transition Assistance Services" means any assistance that Quest Diagnostics may reasonably request from the Agency to enable Quest Diagnostics to transition to another Agency or Agencies, if so requested by Quest Diagnostics…

22.     Section 2.4 of the Services Agreement provides:

*Effect of Termination.*     Expiration or Termination of this Agreement for any reason shall not relieve the parties of rights or obligations incurred prior to the effective date of expiration or termination which by their nature are intended to survive termination.  The rights and remedies provided hereunder shall be cumulative and be in addition to all rights and remedies available to the parties in law and equity.

23.     Section 8.3(h) of the Services Agreement provides:

<u>Report Requests</u>.   Any Business Unit [of Quest] may submit reasonable written requests for additional or different reports from time to time.  Upon [NAM's] receipt of written request from a Business Unit, Agency shall promptly evaluate the request to determine whether it can provide the report and the estimated time and the level of effort required to produce the report…

24.     Section 14.2 of the Services Agreement provides:

(a)  Except in cases where a Party is seeking immediate injunctive relief, before either Party files suit, the Party must send written notice of the Dispute to the other Party… The Designated Contacts shall meet in person to resolve the Dispute.  This meeting shall occur within ten Business Days after either Party asks, in writing, to escalate the matter to the Designated Contacts…

(b)  Any Dispute will be resolved exclusively in the state or federal courts of New Jersey.  Each of the Parties hereby expressly submits to the personal jurisdiction of the foregoing courts located in New Jersey and waives any objection or defense based on

personal jurisdiction or venue that might otherwise be asserted in proceedings in those courts…

(c)  The laws of the State of New Jersey… will govern all matters arising out of or relating to this Agreement and all the transactions it contemplates, including its validity, interpretation, construction, performance and enforcement.  [NAM] submits to the jurisdiction of the federal and state courts located in New Jersey.

(d)  Each Party may seek from any court having jurisdiction any interim or provisional relief necessary to protect that Party's rights or property.

### Defendants' Wrongful Conduct

25.     On multiple occasions in December 2013 and earlier, Briggs and other employees and/or representatives of NAM failed to inform Quest that NAM was planning on going out of business.

26.     Based on this omission, Quest continued to place receivables with NAM despite the fact that NAM, Eightfold and/or Briggs knew that NAM would not be able to service those claims.

27.     Quest continued to place claims with NAM through the end of 2013.

28.     Without any warning, on or about January 7, 2014, Quest received a letter dated January 1, 2014 from Jenyce M. Woodruff, Esq., acting legal counsel for NAM and Eightfold.  A true and correct copy of the January 1, 2014 letter is hereby attached as Exhibit D.  Interestingly, Ms. Woodruff's email address is jwoodruff@*eight-fold.com. Id.* (emphasis added).

29.     The letter provided as follows:

This correspondence shall serve as notice of termination of the Services Agreement dated as of November 2, 2007 and amended from time to time (hereinafter the "Agreement") between NAM and Quest.  NAM is no longer be [sic] able to perform the services as provided by the Agreement.  It is with deep regret that NAM must end this mutually beneficial relationship with Quest as it has certainly been a pleasure to work with such a fine company over the years.

> According to industry standards, NAM certifies that any and all
> Protected Health Information will be properly destroyed.
>
> Please be aware that due to NAM winding down initiatives, it has
> been discovered that Quest withdrew a multitude of patient debtor
> accounts that were set to be paid by the insurance without
> remitting the proper commission payment to NAM.  NAM is in the
> process of performing an internal audit to ascertain the exact
> amount owed by Quest and will provide notice and a final invoice
> accordingly.  To that end, NAM respectfully requests that Quest
> perform an internal audit and provide NAM with direct payment
> and insurance payment records from the inception of the
> Agreement to the present date.  Please also be advised that all
> future ACH payments will be held in escrow until a proper
> accounting can be completed.

30.     This purported termination letter does not comply with the terms of the Services

Agreement.   First, under the Services Agreement, NAM is not permitted to terminate the

Agreement for "convenience," only Quest is.  NAM does not contend that Quest was in breach

of the Services Agreement, and, even if it did, NAM would need to provide Quest with a ten-day

cure period, which it did not.

31.     Second, nothing in the Services Agreement permits NAM to hold "future ACH

payments" in escrow, or to hold any of Quest's assets in escrow whether or not Quest owes any

commission payments.

32.     On January 8, 2014, Christopher J. Plocinik of Quest sent an email to Brian

Hinckley at NAM, with a carbon copy to NAM's attorney, requesting a meeting to assess and

understand the situation.  A true and correct copy of the January 8, 2014 email is hereby attached

as Exhibit E.  No one responded on behalf of NAM.

33.     On January 14, 2014, Ralph Breindel of Quest sent two emails to Defendant

Briggs of NAM requesting information regarding the status of Quest's accounts at NAM.  A true

and correct copy of the January 14, 2014 emails are hereby attached as Exhibit F.  Defendant

Briggs did not respond to the emails.  Mr. Breindel additionally tried calling Mr. Briggs or

anyone at NAM on multiple occasions, but despite leaving multiple messages, no one returned his calls.

34.     Also on January 14, 2014, counsel for Quest sent a letter to Ms. Woodruff, counsel for NAM, demanding that NAM immediately: "(1) stop all commercial activity on behalf of the Company; (2) perform an accounting of the receivables and the amounts collected that have not yet been paid to Quest; (3) advise as to the status of each and every account in the collection cycle process; (4) assist in the transition of the accounts back to Quest; and (5) return all of the funds that have been collected on behalf of Quest." A true and correct copy of the January 14, 2014 letter is hereby attached as Exhibit G. Ms. Woodruff did not respond to the letter. Moreover, a call to Ms. Woodruff by counsel for Quest has also gone unanswered.

35.     Over the past two weeks, Quest has made repeated attempts to contact both employees and principals at NAM, as well as their attorney, via email, letter and phone calls but has received no responses. At this point, Quest has been provided with no information as to (a) whether NAM is still performing services on behalf of Quest and collecting amounts due from its customers, (b) the status of claims being serviced by NAM, and (c) how much of Quest's assets NAM is purporting to hold in escrow in violation of the Services Agreement.

36.     Upon information and belief, NAM is still accepting payments on the collections it pursued on behalf of Quest and is wrongfully retaining the amounts paid.

## COUNT I
### (Constructive Trust Against Defendants)

37.     Quest realleges and incorporates paragraphs 1 through 30, as though fully set forth herein.

38.     Defendants currently have possession of Quest's assets, consisting of amounts collected by NAM on behalf of Quest.

39.     At all times, the assets held by Defendants were intended to be held for Quest's benefit and Defendants' possession of those funds is wrongful.

40.     Defendants are liable for the disgorgement of these assets to Quest.

41.     Retention of property or beneficial interest would unjustly enrich Defendants, and equity must hold Defendants accountable as a trustee.

42.     A constructive trust should be imposed on the assets held by Defendants that rightfully belong to Quest.

**WHEREFORE**, Quest respectfully requests that the Court enter an order that:

(1)     Defendants be temporarily restrained from dissipating the assets of Quest that they are holding;

(2)     Defendants be preliminarily enjoined from performing any further commercial activity on behalf of Quest, including, but not limited to, receiving payments on behalf of Quest;

(3)     a constructive trust be imposed on any of Quest's assets held by Defendants;

(4)     Defendants provide an accounting of the assets held on behalf of Quest;

(5)     Defendants be ordered to immediately transfer Quest's assets back to Quest;

(6)     Quest be reimbursed by Defendants for any and all attorneys' fees, costs, and expenses incurred as a result of the wrongful conduct described herein, including such costs and fees incurred in this litigation; and

(7)     This Court grant such other and further relief as it may deem just and equitable.

## COUNT II
### (Breach of Contract against Defendant NAM)

43.     Quest realleges and incorporates paragraphs 1 through 36, as though fully set forth herein.

44.     The express terms of the Services Agreement prohibited NAM from terminating the Services Agreement without proper notice and without cause.

45.     By purporting to terminate the Services Agreement and hold Quest's assets in escrow, NAM has breached the Services Agreement and continues to breach the Service Agreement by refusing to communicate with Quest, refusing to provide an accounting, refusing to provide transition services, and refusing to turnover Quest's assets.

46.     The purported termination of the Services Agreement by NAM has put Quest's assets at risk and deprives Quest of the benefits of the contract into which it entered.

47.     NAM's purported termination of the Services Agreement has caused Quest immediate and irreparable harm that cannot be repaired by money damages alone.   Unless enjoined, NAM will continue to cause Quest immediate and irreparable harm.

48.     Additionally, in breach of the Services Agreement, NAM has not provided Quest with the requested accounting or transfer of Quest's assets as the Services Agreement requires.

49.     Quest performed fully its obligations under the Services Agreement.

50.     NAM's intentional breaches of the Services Agreement has injured Quest's business, thereby causing Quest to suffer irreparable harm.

51.     Quest is entitled to injunctive relief.

**WHEREFORE**, Quest respectfully requests that the Court enter an order that:

(1)     Defendants be temporarily restrained from dissipating the assets of Quest that they are holding;

(2)     Defendants be preliminarily enjoined from performing any further commercial activity on behalf of Quest, including, but not limited to, receiving payments on behalf of Quest;

(3)     a constructive trust be imposed on any of Quest's assets held by Defendants;

(4)     Defendants provide an accounting of the assets held on behalf of Quest;

(5)     Defendants be ordered to immediately transfer Quest's assets back to Quest;

(6)     Quest be reimbursed by Defendants for any and all attorneys' fees, costs, and expenses incurred as a result of the wrongful conduct described herein, including such costs and fees incurred in this litigation; and

(7)     This Court grant such other and further relief as it may deem just and equitable.

## COUNT III
### (Breach of the Covenant of Good Faith and Fair Dealing against Defendant NAM)

52.     Quest realleges and incorporates paragraphs 1 through 45, as though fully set forth herein.

53.     Pursuant to the Services Agreement, NAM may not terminate the Services Agreement without providing appropriate notice and is not permitted to hold Quest's funds in escrow.

54.     When Quest became aware of NAM's intention to terminate the Services Agreement, Quest repeatedly notified NAM that the purported termination was in direct breach of the Services Agreement and requested that someone at NAM provide additional information regarding the status of Quest's accounts.

55.     NAM has entirely ignored Quest's requests for information and for the return of its assets.

56.     NAM's actions and/or omissions were taken with malice, bad faith and/or reckless indifference to Quest's rights under the Services Agreement.

57.     By its actions, NAM intended to deprive Quest of its rights under the Services Agreement.

58.     NAM breached the implied covenant of good faith and fair dealing by engaging in this improper conduct, breaching the Services Agreement, and ignoring and resisting Quest's repeated good faith attempts to resolve the dispute.

59.     As a result of these actions, Quest has suffered damages.  NAM has benefited financially as a result of its improper actions.

**WHEREFORE**, Quest respectfully requests that the Court enter an order that:

(1)     Defendants be temporarily restrained from dissipating the assets of Quest that they are holding;

(2)     Defendants be preliminarily enjoined from performing any further commercial activity on behalf of Quest, including, but not limited to, receiving payments on behalf of Quest;

(3)     a constructive trust be imposed on any of Quest's assets held by Defendants;

(4)     Defendants provide an accounting of the assets held on behalf of Quest;

(5)     Defendants be ordered to immediately transfer Quest's assets back to Quest;

(6)     Quest be reimbursed by Defendants for any and all attorneys' fees, costs, and expenses incurred as a result of the wrongful conduct described herein, including such costs and fees incurred in this litigation; and

(7)     This Court grant such other and further relief as it may deem just and equitable.

## COUNT IV
### (Conversion against Defendants)

60.     Quest realleges and incorporates paragraphs 1 through 53, as though fully set forth herein.

61.     Pursuant to the Services Agreement, Quest has placed millions of claims with NAM over the years.  Quest currently has placed approximately $90 million worth of its receivables with NAM.

62.     These receivables are Quest's property.  Any amounts that NAM receives as payment towards these receivables are Quest's property.

63.     Defendants have no right to payments received in connection with Quest's claims. Quest pays a separate commission to NAM as provided by contractual agreement.

64.     Defendants' refusal to turnover Quest's assets to Quest and insistence on holding those amounts "in escrow" is a wrongful interference with Quest's property rights.

**WHEREFORE,** Quest respectfully requests that the Court enter an order that:

(1)     Defendants be temporarily restrained from dissipating the assets of Quest that they are holding;

(2)     Defendants be preliminarily enjoined from performing any further commercial activity on behalf of Quest, including, but not limited to, receiving payments on behalf of Quest;

(3)     a constructive trust be imposed on any of Quest's assets held by Defendants;

(4)     Defendants provide an accounting of the assets held on behalf of Quest;

(5)     Defendants be ordered to immediately transfer Quest's assets back to Quest;

(6)     Quest be reimbursed by Defendants for any and all attorneys' fees, costs, and expenses incurred as a result of the wrongful conduct described herein, including such costs and fees incurred in this litigation; and

(7)     This Court grant such other and further relief as it may deem just and equitable.

## COUNT V
### (Fraud against Defendants)

65.     Quest realleges and incorporates paragraphs 1 through 64, as though fully set forth herein.

66.     On multiple occasions in December 2013, Briggs and other employees and/or representatives of NAM failed to inform Quest that NAM was going out of business.  To the contrary, they gave Quest the impression that NAM was continuing with business as usual.

67.     Based on this glaring omission, Quest continued to place its receivables with NAM despite the fact that NAM, Eightfold and/or Briggs knew well in advance of January 1, 2014 that NAM would not be able to service those claims.

68.     Quest's reliance on the fact that NAM would continue to operate as a collection business was reasonable given the party's relationship of over six years.

69.     As a result of Quest's reasonable reliance, Quest continued to place receivables with NAM through the end of 2013, and Defendants now refuse to provide Quest with the amounts they are holding, or any even information about the amounts they are holding.

70.     As a result of Defendants' actions, Quest has been damaged.

**WHEREFORE**, Quest respectfully requests that the Court enter an order that:

(1)     Defendants be temporarily restrained from dissipating the assets of Quest that they are holding;

(2)     Defendants be preliminarily enjoined from performing any further commercial activity on behalf of Quest, including, but not limited to, receiving payments on behalf of Quest;

(3)     a constructive trust be imposed on any of Quest's assets held by Defendants;

(4)     Defendants provide an accounting of the assets held on behalf of Quest;

(5)     Defendants be ordered to immediately transfer Quest's assets back to Quest;

(6)     Quest be reimbursed by Defendants for any and all attorneys' fees, costs, and expenses incurred as a result of the wrongful conduct described herein, including such costs and fees incurred in this litigation; and

(7)     This Court grant such other and further relief as it may deem just and equitable.


Dated: Short Hills, New Jersey
        January 22, 2014


**DLA PIPER LLP (US)**


By:     s/ Joseph D. Guarino
        Joseph D. Guarino
        51 John F. Kennedy Parkway, Suite 120
        Short Hills, NJ 07078
        (973) 520-2569

        *Attorneys for Plaintiff Quest Diagnostics Incorporated*

# VERIFICATION

I, Ralph Breindel, declare:

I am employed by Quest Diagnostics Incorporated ("Quest"), as Director, Cash/Bad Debt Solutions and I am duly authorized to sign this Verification on behalf of Quest.

I have read Quest's Complaint. I have knowledge of the facts set forth in the Complaint and believe them to be true to the best of my knowledge as of the date of the Complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I executed this Verification on January 22, 2014, at Norristown, Pennsylvania.

RALPH BREINDEL

# EXHIBIT A



**Quest Diagnostics**

### SERVICES AGREEMENT

This Services Agreement ("Agreement"), effective November 2, 2007 ("Effective Date") is between Quest Diagnostics Incorporated, a Delaware corporation with offices at 1290 Wall Street West, Lyndhurst, New Jersey 07071 ("Quest Diagnostics") and National Asset Management, LLC, a Pennsylvania corporation having with offices at 400 Rouser Road Suite 202, Moon Township, PA 15108 ("Agency").

### BACKGROUND

Quest Diagnostics wishes to engage Agency to perform certain services as further described in this Agreement. Agency has the knowledge and expertise to perform the Services. Agency desires to accept this engagement. This Agreement sets forth the terms and conditions pursuant to which Agency will perform the Services. In consideration of the foregoing and of the mutual covenants and agreements contained in this Agreement, the parties, intending to be legally bound, agree as follows:

1. **GENERAL PROVISIONS**

   1.1. *Definitions.* Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth below:

   (a) "Applicable Laws" are the International, federal, state, and local laws, rules, and regulations that relate to the conduct of the parties' businesses and the performance by the parties of their respective obligations under this Agreement.

   (b) "Business Unit" is (i) Quest Diagnostics, (ii) any limited liability company, partnership, joint venture, or other similar entity of which Quest Diagnostics is a party, (iii) any licensed, clinical laboratory owned by Quest Diagnostics, or (iv) any wholly owned subsidiary of Quest Diagnostics.

   (c) "Confidential Information" is any information or materials disclosed by or on behalf of one Party ("Disclosing Party") relating to the Disclosing Party's business or operations that is (i) not generally known other than by the Disclosing Party, and (ii) the Receiving party may learn about due to entering into this Agreement. Confidential Information includes the existence and terms of any negotiations between the Parties, both written and oral, and the terms and conditions of this Agreement. Confidential Information does not include information that:

   | | |
   |---|---|
   | i. | Was independently developed by the Receiving Party and that development can be documented, |
   | ii. | Known to the Receiving Party before receiving it pursuant to this Agreement and that knowledge can be documented, |
   | iii. | is later obtained from a third party without an obligation of confidentiality or secrecy, or |
   | iv. | Was or becomes knowledge of the public through no fault of the Receiving Party. |

   (d) A "*Force Majeure Event*" is an act or event, foreseen or unforeseen, that (i) prevents a party from performing its obligations under this Agreement ("Non-Performing Party"); (ii) is beyond the control and not the fault of the Non-Performing Party, and (iii) the Non-Performing Party has been unable to avoid or overcome the act or event by exercising due diligence. A *Force Majeure* Event does not include economic hardship, changes in market conditions, or insufficiency of funds.

   (e) "Quest Diagnostics Location" is any location where Quest Diagnostics may require Agency to perform the Services.

   (f) "Relationship Manager" is defined in Subsection 8.1.

(g)   "Services" are the patient and employee collections services provided or required to be provided by Agency pursuant to this Agreement and more fully described in Subsection 3.1 and Schedule 3.1.

1.2.   *Eligible Purchasers.* Quest Diagnostics has entered into this Agreement for the benefit of itself and other Quest Diagnostics Entities. Any Business Unit may purchase Services under this Agreement. Quest Diagnostics may also purchase Services under this Agreement on behalf of laboratories for which it provides management services.

(a)   If requested by Agency, any limited liability company, partnership, joint venture, or other similar entity of which Quest Diagnostics is a party but does not own a majority interest that elects to purchase Services under this Agreement will execute a written agreement with Agency. That agreement will be in a format similar to that of Exhibit B.

(b)   If, after the Effective Date, an entity with a pre-existing agreement with Agency, or a third party, to purchase Services becomes a Business Unit, Quest Diagnostics may elect to have the new Business Unit continue purchasing Services under the existing agreement or purchase Services under this Agreement. If the new Business Unit will purchase Services under this Agreement, any pre-existing agreement between Agency and the new Business Unit will be terminated as of the date the new Business Unit begins purchasing under this Agreement. There shall be no adverse financial or other consequences to Quest Diagnostics or the new Business Unit because of that termination.

1.3.   *No Minimum Purchases.* The parties agree that this Agreement is not a requirements contract or guaranteed minimum agreement. Quest Diagnostics' failure to meet a specific purchase rate will not result in any penalty or other financial obligation to Quest Diagnostics.

2.   CONTRACT PERIOD AND EXPIRATION OR TERMINATION

2.1.   *Contract Period.* The Initial Contract Period for this Agreement will start on the Effective Date and expire THIRTY-SIX months thereafter, unless terminated sooner as provided in this Agreement. Quest Diagnostics has the option to extend this Agreement for an unlimited number of one-year periods (each a "Renewal Period") upon at least thirty days' advance written notice to Agency before the end of the then-current Contract Period. The "Contract Period" means either the Initial Contract Period or any Renewal Period. This Agreement shall not automatically renew.

2.2.   *Termination.* This Agreement may be terminated as follows:

(a)   For Cause. If either party breaches a material term of this Agreement, the non-breaching party may terminate the Agreement upon giving the breaching party ten days' advance written notice of the non-breaching party's decision to terminate this Agreement if the breach is not cured within that ten-day period. If, during this ten-day period, the breaching party cures the breach or makes substantial progress towards curing the breach, this Agreement will remain in effect.

(b)   For Convenience. Quest Diagnostics may terminate this Agreement at any time, without cause, upon thirty days' advance written notice to Agency. If Quest Diagnostics' termination is not the result of a breach by Agency, Quest Diagnostics agrees to compensate Agency for any work already approved and performed prior to the date of termination, so long as Agency agrees to stop all work to the extent specified in the notice of termination.

(c)   Other Provisions. As provided elsewhere in this Agreement.

2.3.   *Transition Assistance Services Upon Termination.* If either party terminates this Agreement for any reason and Quest Diagnostics requests Transition Assistance Services, Agency will provide Transition Assistance Services for up to ninety days, or as agreed between the parties. "Transition Assistance Services" means any assistance that Quest Diagnostics may reasonably request from Agency to enable Quest Diagnostics to transition to another Agency or Agencies, if so requested by Quest Diagnostics. During the transition, Agency will maintain contracted pricing in force and all terms and conditions of this Agreement shall remain in effect until the transition is complete.

2.4.   *Effect of Termination.* Expiration or Termination of this Agreement for any reason shall not relieve the parties of rights or obligations incurred prior to the effective date of expiration or termination which by their nature are intended to survive termination. The rights and remedies provided hereunder shall be cumulative and be in addition to all rights and remedies available to the parties in law and equity.

3.   SERVICES

3.1.   *Request for Services.* Agency agrees to provide the Services listed on Schedule 3.1 at the fees set forth in Exhibit A, to any Business Unit requesting the Services. Agency shall render all Services in accordance with the terms and conditions of this Agreement and all Schedules. Agency shall not, without Quest Diagnostics' advance written consent, use any contractor, subcontractor, or other person not employed by Agency to perform the Services.

3.2.    *Customer Service.* Agency shall maintain a customer service department to respond to general inquiries. A customer service representative shall answer the telephones from 9:00 AM until 5:00 PM (local time), Monday through Friday, excluding Agencies holidays listed on Schedule 3.1, and shall respond to all calls, immediately, but in no event later than one hour from the time of the initial call.

3.3.    *Implementation.* The Quest Diagnostics Billing Program Office will be the primary point of contact during the Implementation phase. Agency agrees to establish an Implementation plan, appoint an implementation manager and assemble an implementation team that will work closely with the Quest Diagnostics Billing Program Office to transition business from Quest Diagnostics incumbent Agency to new Agency.  Agency shall develop an implementation tool to be used by the Implementation Manager to establish a detailed implementation plan, schedule time and resources and report progress toward implementation targets.  Quest Diagnostics Billing Program Office must approve the implementation Tool and corresponding plans prior to execution of this agreement.

3.4.    *System Security Requirements.* To protect the Quest Diagnostics environment and Quest Diagnostics Data from security threats, it is necessary to ensure that all systems meet minimum standards for confidentiality, integrity, and availability. If Supplier has access or controls the operation of any Quest Diagnostics information system, network, or website, Supplier shall abide by all Quest Diagnostics security, operating, and safety procedures in effect during the term of this Agreement. Quest Diagnostics may immediately terminate this Agreement effective upon notice to Supplier if Supplier materially breaches any Quest Diagnostics security, operating or safety procedures, reserving cumulatively all other rights and remedies available at law and in equity. These minimum requirements are specified on Schedule 3.5, Quest Diagnostics may modify these requirements from time to time, provided, however, that Supplier shall be entitled to adjust applicable prices to reflect the recovery of Supplier's additional costs incurred in connection any modification requirements.

**COMPENSATION**

4.1.    *Fees.* Quest Diagnostics agrees to pay Agency for the Services performed according to the fees set forth in Exhibit A. Unless expressly agreed to in writing by Quest Diagnostics, Quest Diagnostics shall not be responsible for any fees or compensation other than as specified in Exhibit A.

4.2.    *Sliding Fee Scale.* If Quest Diagnostics pays Agency on a sliding fee scale and Agency believes that it has reached the next payment tier for Services, Agency will notify Quest Diagnostics in writing and provide appropriate documentation to support its position. Quest Diagnostics will have forty-five days to review Agencies documentation and to notify Agency of a dispute if warranted in accordance with Subsection 5.3. Fees shall remain static during the review period.

5.      **RECONCILIATION STATEMENTS AND PAYMENT TERMS** –

5.1.    *Invoices.* Agency shall send Quest Diagnostics, on a monthly basis, a summary invoice for the Services provided during the prior month in accordance with the prices set forth in Exhibit A. Agency shall mail the invoice to the appropriate Quest Diagnostics Entity to the address designated by Quest Diagnostics or invoice Quest Diagnostics by electronic data interchange. If Quest Diagnostics submits a notice of termination or partial termination to Agency, Agency shall, within two months after the effective date of termination, submit its invoice to Quest Diagnostics for any amounts due. Agencies failure to submit an invoice within the time allowed would relieve Quest Diagnostics from the obligation for paying any amount beyond that which Quest Diagnostics may verify from its records as due and payable and that determination shall be final. Quest Diagnostics will pay amounts due in accordance with Subsection 5.2.

5.2.    *Payment Terms.* Except as provided in Subsection 5.4, Quest Diagnostics has two options for payment.

(a)  Agency would retain contingency fees while submitting net recoveries by electronic funds transfer to Quest Diagnostics within seven days of receipt or contingency fees will be extracted from payments in accordance with Subsection 5.2(b). Contingency fees will be based on the sliding scale set forth in Exhibit A. If Quest Diagnostics submits a notice to terminate, Quest Diagnostics may allow Agency to work placements until conclusion and contingency fees will be paid or placements will be transferred to another Agency.

(b)  Agency will send Quest Diagnostics a monthly invoice as provided in Subsection 5.1.  Payment Terms are NET 30 Days after Quest Diagnostics receives Provider's invoice for the Services accepted by Quest Diagnostics. All payments by Quest Diagnostics to Provider under this Agreement are without prejudice to Quest Diagnostics' claims, rights, or remedies.

5.3.    *Taxes.* Unless Quest Diagnostics gives Agency proof of exemption from taxation, Quest Diagnostics shall be responsible for applicable taxes payable as a matter of law with respect to Quest Diagnostics' purchase of the Services, including sales and use taxes, if any. Quest Diagnostics shall be not be responsible for any other taxes, including federal or state income or similar taxes based on Agencies income or assets, unemployment compensation, worker's compensation, Federal Insurance

Contributions Act, Federal Unemployment Tax Act or other taxes, costs, or expenses incurred by Agency in providing the Services, which Agency shall pay. Agency shall calculate the taxes payable by Quest Diagnostics and include these taxes on the statements delivered to Quest Diagnostics.

5.4. *Reconciliation Disputes.* If there is a bona fide dispute over any Reconciliation Statement submitted by Agency, Quest Diagnostics will notify Agency and specify the reasons for the dispute. Notwithstanding any dispute, Agency shall continue to perform its obligations under this Agreement. With respect to any Reconciliation Statement for which there is a bona fide dispute, authorized representatives of the parties shall meet, by telephone or in person, in good faith to discuss the dispute. If the parties are unable to resolve a dispute within forty-five days after Quest Diagnostics sends Agency the notice of a dispute, either party may seek to resolve the dispute in accordance with Subsection 14.2. Once the dispute is resolved, Quest Diagnostics will either grant permission to hold a higher contingency fee or Agency will resort to holding fees based on the lower tier.

6. **REPRESENTATIONS AND WARRANTIES**
6.1. *Service Warranties.* Agency represents, warrants and covenants that:
a. All Services will:

i. Be rendered in a competent, timely, professional, and workmanlike manner that conforms to generally accepted industry standards and procedures for similar services in the jurisdiction in which Agency provides the Services;

ii. Be performed in accordance with the terms of this Agreement;

iii. Meet or exceed Agencies normal levels of quality and quality assurance standards; and

iv. Be performed in accordance with manufacturer specifications for equipment used in performing the Services, if any, and all Applicable Laws.

b. Each of its personnel assigned to perform Services has the proper skill, training, and background so as to be able to perform in a competent and professional manner.

c. Neither it nor any of its personnel is currently debarred, suspended, or otherwise excluded by Government Agencies from receiving, bidding on or participating in, contracts with United States government entities.

7. **PERFORMANCE STANDARDS**
7.1. *Service Levels.* Service Levels are the performance standards and commitments that Agency must provide under this Agreement, as set forth in this Subsection and Schedule 8.1. Agency shall perform the Services at a level at least equal to the specific Service Levels identified in this Agreement and Schedule 8.1 and be consistent with the then current standards used by well-managed operations that perform services similar to these Services. In addition to the agreed, specific minimum performance objectives set forth in Schedule 8.1, a Service Level also includes any performance objectives or standards that Agency advertises it maintains or provides generally to its customers and potential customers or specifically represented to Quest Diagnostics in its response to a Request for Proposal, if any, from Quest Diagnostics.

7.2. *Notice of Continued Service Failures.* Quest Diagnostics will notify Agency of Agencies continued failure to meet any Service Level of which Quest Diagnostics becomes aware. Quest Diagnostics' failure to notify Agency of Agencies failure to meet a Service Level shall not constitute a waiver of Quest Diagnostics' rights under this Agreement, in equity, or under Applicable Law. Without limiting Agencies obligations, if Agency fails to meet any Service Level, Agency shall:

(a) Promptly investigate and report to Quest Diagnostics the reasons why Agency failed to meet the Service Level;

(b) Advise Quest Diagnostics of the status of remedial efforts being undertaken with respect to Agencies failure to meet the Service Level;

(c) Use reasonable efforts to correct the problems for which Agency is responsible and begin meeting the Service Level as soon as is practicable;

(d) Take appropriate preventive measures to reduce the potential recurrence of the failure to meet the Service Level; and

(e) Document all proposed corrective actions and submit them to Quest Diagnostics for approval.

7.3. *Administrative Charges.* Quest Diagnostics will consider Agencies failure to adequately resolve recurring problems or any upward trend in the number of requests by Quest Diagnostics Entities for corrective action as an indication that Agency lacks good faith in performing under this Agreement. When Quest Diagnostics provides written notice and opportunity to

cure more than twice during any six-month period, Quest Diagnostics may assess an administrative charge based on the following structure:

    (a)    First occurrence - $2,000;

    (b)    Second occurrence - $5,000;

    (c)    Third occurrence - written notice, $7,500 penalty, and may consider this a material breach.

8.    RELATIONSHIP MANAGER/MEETINGS/REPORTS

    8.1.    *Relationship Managers.* Each party will designate a Relationship Manager who will be responsible for communications about the relationship and who will have decision-making authority for the appointing party. Each party will consult with the other before changing its Relationship Manager. The Quest Diagnostics Relationship Manager may be the Sourcing Manager.

    8.2.    *Meetings.* During the Contract Period, the parties will meet quarterly at a mutually agreeable time and place or by telephone to review and discuss, in good faith, the parties' performance as well as issues or concerns arising under this Agreement. The Relationship Managers may invite other members of their organizations to participate in these meetings from time to time.

    8.3.    *Reporting.* Agencies will submit reports electronically to Quest Diagnostics. Reports will be made available in Microsoft Excel and Delimited text formats. Each report will provide details at the Business Unit, Region and Quest Diagnostics Centralized/Decentralized levels. In addition, Agency shall provide access to reports required by Quest Diagnostics via Agencies Internet website. Quest Diagnostics users shall have the ability to download reports directly from the portal at any time. Agency shall update the data in the portal on a daily basis, or as specified otherwise in this Agreement. Report examples and specifications are attached.

    (a).    *Recovery Summary Report.* This report provides a view of collection history by Business Unit. Quest Diagnostics requires one report for each Business Unit and another for total business. This report will be based on gross placement and total collection amount. Frequency: Monthly.

**Field Definitions**
Location – Quest Diagnostic Business Unit
# Of Accounts Placed – Count of placements by Business Unit
Average $ Placed – Gross Placement dollars divided by # of Accounts placed
Placements $ – Gross Placement in dollars
Collections $ – Gross collections in dollars
Collection % - Total collection as a percentage of Gross Placements

| Location | # of Accounts Placed | Placements $ | Average $ Placed | Collections $ | Collections % |
|---|---|---|---|---|---|
| | | | 2006 Inventure | | |
| Atlanta | 5,555 | $2,222,222 | 400.00 | $2,222 | |
| Dallas | 5,555 | $2,222,222 | 400.00 | $2,222 | |
| King of Prussia | 5,555 | $2,222,222 | 400.00 | $2,222 | |
| Houston | 5,555 | $2,222,222 | 400.00 | $2,222 | |
| Cincinnati | 5,555 | $2,222,222 | 400.00 | $2,222 | |
| Miami | 5,555 | $2,222,222 | 400.00 | $2,222 | |
| New Orleans | 5,555 | $2,222,222 | 400.00 | $2,222 | |
| Nashville | 5,555 | $2,222,222 | 400.00 | $2,222 | |
| Lenexa | 5,555 | $2,222,222 | 400.00 | $2,222 | |
| Tampa | 5,555 | $2,222,222 | 400.00 | $2,222 | |
| PNW | | | | | |
| Central total | 55,550 | $22,222,220 | 400.00 | $2,222 | |

(b)  Date of Service Report  This report will break down placement aging by Business Unit. Frequency: Monthly

Field Definitions
File - Internal Agency file number
Service Date - the date the Patient service was provided (Quest Diagnostics provided)
Entry Date - Month of placement to Agency
Record Count - Total number of records that fall into that Entry Month
Amount - Total dollars that correlate to the Record Count
Claim age - Entry Date minus Service Date
Day Range – Claim Age count by Aging Bucket

**Date of Service Report (DOS)**

| FILE | SERVICE DATE | ENTRY DATE | RECORD COUNT | AMOUNT | CLAIM AGE |
|------|------|------|------|------|------|
| 431 | Jul-05 | 1/26/2007 | 1 $ | 56.50 | 560 |
| 431 | Aug-05 | 1/26/2007 | 1 $ | 24.92 | 525 |
| 431 | Dec-05 | 1/26/2007 | 2 $ | 61.02 | 400 |
| 431 | Jan-06 | 1/26/2007 | 24 $ | 822.66 | 374 |
| 431 | Feb-06 | 1/26/2007 | 28 $ | 712.07 | 346 |
| 431 | Mar-06 | 1/26/2007 | 46 $ | 1,056.00 | 295 |
| 431 | Apr-06 | 1/26/2007 | 63 $ | 1,333.20 | 284 |
| 431 | May-06 | 1/26/2007 | 109 $ | 4,686.78 | 240 |
| 431 | Jun-06 | 1/26/2007 | 431 $ | 9,068.51 | 222 |
| 431 | Jul-06 | 1/26/2007 | 333 $ | 15,822.51 | 176 |
| 431 | Aug-06 | 1/26/2007 | 1,322 $ | 22,778.84 | 156 |
| 431 | Sep-06 | 1/26/2007 | 893 $ | 24,288.35 | 133 |
| 431 | Oct-06 | 1/26/2007 | 1 $ | 39.70 | 114 |

**DOS BY AGING BUCKET**

| DAY RANGE | | RECORD COUNT | AMOUNT | PERCENT OF TOTAL |
|------|------|------|------|------|
| DAY RANGE | 0 | 0 | 0 $ | · | 0% |
| | 0 | 120 | 1 $ | 39.70 | 0% |
| | 120 | 150 | 893 $ | 24,288.35 | 26% |
| | 150 | 180 | 2,855 $ | 48,091.26 | 53% |
| | 180 | 210 | 0 $ | · | 0% |
| | 210 | 240 | 630 $ | 14,555.13 | 16% |
| | 240 | 300 | 111 $ | 2,489.20 | 3% |
| | 300 | 330 | 0 $ | · | 0% |
| | 330 | 360 | 28 $ | 712.07 | 1% |
| | 360 | 9999 | 32 $ | 903.10 | 1% |
| FILE TOTAL | | | 3,710 $ | 91,660.93 | |

(c)  Spin-Down Report  This report will show the dollars collected on each segment of work placed over a number of years. It allows the Quest Diagnostics Business Unit to see the collection Agencies performance from new to fully matured accounts. Frequency: Monthly

Field Definitions

Placement Month -- Calendar month in which debt was placed at Agency
# Of Accounts Placed -- Count of placements by Business Unit
Average Age of Placement -- Sum of days divided by # of Accounts Placed
Gross Placement Amount -- Total dollars placed for a month
Net Placement Amount -- Placement dollar after adjustments
Total Recovered -- Dollars collected before fee or charges
Gross Percent Recovery -- Recovered debt before adjustment shown as a percentage
Net Percent Recovery-- Recovered debt after adjustment shown as a percentage
Current ---Recovered debt after adjustments shown on current placements-less than 30 days received.
Aging Buckets -- 30 day buckets grouped by age of placement

| Placement Month | # of Accounts Placed | Average age of Placement | Gross Placement Amount | Net Placement Amount | Total Recovered | Gross Percent Recovery | Percent Recovery |
|---|---|---|---|---|---|---|---|
| Jan-07 | 5,555 | | $ 2,590,540 | $ 2,333,139 | $ 417,101 | 16% | 19% |
| Feb-07 | 5,555 | | $ 2,228,441 | $ 2,001,392 | $ 288,892 | 13% | 14% |
| Mar-07 | 5,555 | | $ 2,492,980 | $ 2,392,017 | $ 237,992 | 10% | 11% |
| Apr-07 | 5,555 | | $ 2,330,796 | $ 2,098,611 | $ 101,414 | 5% | 5% |
| May-07 | 5,555 | | $ 2,456,139 | $ 2,396,568 | $ 91,000 | 4% | 4% |
| Jun-07 | 5,555 | | $ | $ | $ | 0% | 0% |
| Jul-07 | 5,555 | | $ | $ | $ | 0% | 0% |
| Aug-07 | 5,555 | | $ | $ | $ | 0% | 0% |
| Sep-07 | 5,555 | | $ | $ | $ | 0% | 0% |
| Oct-07 | 5,555 | | $ | $ | $ | 0% | 0% |
| Nov-07 | 5,555 | | $ | $ | $ | 0% | 0% |
| Dec-07 | 5,555 | | $ | | | 0% | 0% |
| 07 Total | 66,660 | | $ 11,098,826 | $ 10,918,337 | $ 1,159,429 | 10% | 11% |

Spin Down Report Aging Bucket Example

| 0-30 | 31-60 | 61-90 | 91-120 | 12-180 | 181-180 | 181-210 | 211-240 | 241-270 | 271-300 | 301-330 | 331-360 | >360 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6% | 4% | 3% | 3% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 13% | 2% | 3% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 5% | 4% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 4% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |

(d)   Activity Report This report will provide detailed, transaction level payment history for a given period by Business Unit. Frequency: Weekly

Field Definitions

File -- Agency internal tracking number
Account -- Quest Diagnostics patient bill number, which is created uniquely for each patient, date of service, and services rendered.
Responsible Party -- Name of either the Spouse or Parent of the Patient

Patient Name – self-explanatory
Address – self-explanatory
City – self-explanatory
State – self-explanatory
Zip – self-explanatory
Date – Date of service at Quest Diagnostics Patient Service Center
Amount – Transaction level amount billed
Transaction – Amount generated by collection activity
Amount paid to Client – Amount sent to Quest Diagnostics
Balance – Collection balance remaining for each transaction line
Description – Transaction description (Quest Diagnostics to provide)

### ACTIVITY REPORT (ATL)
### 20070512 thru 20070525

| FILE | ACCOUNT | Responsible Party | Patient NAME | ADDRESS | CITY | ST | ZIP | DATE | AMT | TRANS | Amount paid to Client | BALANCE | Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 979 | 2004140235 Smith, Joe | Smith, Joe | 4243 CHURCHILL TER | ANNISTON | AL | 36201 | 70515 | 28.88 | 28.88 | 0 | 0 | MEDICAID |
| 986 | 2618974356 Smith, Joe | Smith, Joe | 4244 CHURCHILL TER | ANNISTON | AL | 36201 | 70515 | 109.9 | 109.9 | 0 | 0 | MEDICAID |
| 1027 | 2799433332 Smith, Joe | Smith, Joe | 4245 CHURCHILL TER | ANNISTON | AL | 36201 | 70515 | 53.9 | 0 | 0 | 53.9 HFCA PAT |
| 1028 | 2832212084 Smith, Joe | Smith, Joe | 4246 CHURCHILL TER | ANNISTON | AL | 36201 | 70515 | 227.9 | 227.9 | 0 | 0 DECEASED |
| 1054 | 2902167925 Smith, Barbara | Smith, Bill | 578 KELLGO RD | BRHWTCN | AL | 36426 | 70522 | 1202.55 | 20 | 0 | 1202.55 PRTL-PMT |
| 1102 | 3137450220 Smith, Barbara | Smith, Bill | 579 KELLGO RD | BRHWTCN | AL | 36426 | 70512 | 104.5 | 104.5 | 0 | 0 PAYMENT |

(c)    Adjustment Reports This report will provide detailed, transaction level adjustment information by Business Unit. The Quest Diagnostics Relationship Manager reserves the right to require Agency to obtain written consent from the Relationship Manager prior to Agency removing any Patient or Account from recovery other than removals based on Allowable Adjustments. The Adjustment Report will be used to reconcile removals from recovery initiated by Agency based on Allowable Adjustments. Frequency: Weekly

Allowable Adjustments:
Bankruptcy, Deceased Patients, Quest Diagnostics directed return of accounts (Legal, Mail Return) Quest Diagnostics directed non-cash balance adjustments (Insurance re-pricing)

Field Definitions
File – Agency internal tracking number
Account – Quest Diagnostics patient-bill number, which is created uniquely for each patient, date of service, and services rendered.
Responsible Party – Name of either the Spouse or Parent of the Patient
Patient Name – self-explanatory
Address – self-explanatory
City – self-explanatory
State – self-explanatory
Zip – self-explanatory
Date – Date of service at Quest Diagnostics Patient Service Center
Amount Billed – Transaction level amount billed
Adjustment Amount – Total amount adjusted
Balance – Collection balance remaining for each transaction line
Adjustment Reason Code – Adjustment description

### Adjustment report (ATL)

| FILE | ACCOUNT | Responsible Party | Patient NAME | ADDRESS | CITY | ST | ZIP | DATE | AMT Billed | Adjustment Amount | BALANCE | Adjustment Reason Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 979 | 2604140251 Smith,Joe | Smith,Joe | 4243 CHURCHILL TER | ANNISTON | AL | 36201 | 20515 | 28.88 | 28.88 | 0 BANKR |
| 986 | 2618974756 Smith,Joe | Smith,Joe | 4244 CHURCHILL TER | ANNISTON | AL | 36201 | 20515 | 109.9 | 109.0 | 0 BANKR |
| 1027 | 2709433332 Smith,Joe | Smith,Joe | 4245 CHURCHILL TER | ANNISTON | AL | 36201 | 20515 | 53.9 | 53.9 | 0 BANKR |
| 1038 | 2832212044 Smith,Joe | Smith,Joe | 123 FRONT ST | AUBURN | AL | 36295 | 20515 | 222.9 | 222.9 | 0 INS REBILL |
| 1051 | 2901167935 Smith,Barbara | Smith,Bill | 578 KEEGO RD | BREWTON | AL | 36426 | 20522 | 1202.55 | 1202.55 | 0 DECEASED |
| 1102 | 3137430270 Smith,Barbara | Smith,Bill | 579 KEEGO RD | BREWTON | AL | 36426 | 20522 | 104.3 | 104.3 | 0 DECEASED |

       (f)     Daily Deposit Report  This report will tie back to the Activity Report and provide specific details behind payments.  (Used in Reconciliation). Frequency: Bi-Weekly

**Field Definitions**
Location - Quest Diagnostics Business Unit
Date – Date of payment transaction by Patient
Total Deposit – Amount deposited each day
Deposit Overpayment – Amount in excess of total amount due
Bounced Check – Payment with insufficient funds
Adjustments – Total amount adjusted

**Daily Deposit Report**

| Location | Due | | Date 24-Jul | Date 25-Jul | Date 26-Jul | Due 27-Jul | Total Deposit | Deposit Overpayment | Bounced Checks | Adjustments |
|---|---|---|---|---|---|---|---|---|---|---|
| ATL | | 100 | | 100 | | 100 | 200 | | 100 | |
| KOP | | | 50 | | 50 | | 100 | 25 | | |
| MIA | | 50 | | 50 | | 50 | 150 | 5 | | |
| Total | | 150 | 50 | 150 | 50 | 50 | 550 | | | 50 |

       (g)     Overpayment Report - This report will tie back to the Daily Deposit Report and provide specific details behind overpayments. (Used in Reconciliation) Frequency: Bi-Weekly

**Field Definitions**
Location - Quest Diagnostics Business Unit
File – Agency internal tracking number
Cycle Dates – Cycle period of overpayment
Account – Quest Diagnostics patient bill number, which is created uniquely for each patient, date of service, and services rendered.
Patient Name – Self-Explanatory
Payment Type – Check or Credit Card
Original Amount – Original Amount of payment from Patient
Overpayment Amount - Payment in excess of total amount due
Balance Due – Amount refunded to Patient
Overpayment Applied – Amount applied to open balances
Overpayment Remaining – Delta to overpayment applied

### Overpayment Report

| Location | File | Cycle Dates | Account # | Account Name | Payment Type | Original Amount | Overpayment Amount | Release Date | Overpayment Applied | Overpayment Remaining |
|---|---|---|---|---|---|---|---|---|---|---|
| KOP | 1200 | 7/2/07-7/31/07 | 123456 | John Doe | CC | 50 | 25 | | | 25 |
| | | | | 1230 Monroe Blvd. | | | | | | |
| | | | | Norristown, PA 19403 | | | | | | |
| MOA | 1201 | | 789123 | Mary Smith | CK | 50 | 5 | | | 5 |
| | | | | 1230 Monroe Blvd. | | | | | | |
| | | | | Norristown, PA 19403 | | | | | | |
| | | | | | | 100 | 30 | 0 | 0 | 30 |

(h)  Report Requests. Any Business Unit may submit reasonable written requests for additional or different reports from time to time. Upon Agencies receipt of a written request from a Business Unit, Agency shall promptly evaluate the request to determine whether it can provide the report and the estimated time and the level of effort required to produce the report. If Agency can provide the report, Agency agrees to use commercially reasonable efforts to make the report available as soon as reasonably practicable, but in no event later than thirty days after notification to Quest Diagnostics that the report can be provided.

9.   COMPLIANCE WITH LAWS.
9.1.   Applicable Laws. Each party will comply with all Applicable Laws. Quest Diagnostics may consider Agencies failure to comply with any Applicable Law to be a material breach of this Agreement.

9.2.   EEO, Affirmative Action, and Small Business. If Quest Diagnostics will use Agencies Services in performing a federal government contract, Agency hereby certifies that all Services provided in the United States are provided in compliance with all applicable requirements, orders, and regulations of the United States Government pertaining to nondiscrimination, equal employment opportunity and affirmative action, including the following, as they may be amended:

(a)   Executive Order 11246, as amended by Executive Order 11375, including 41 CFR Part 60.1 et seq., and 48 CFR 52.222-26, Equal Opportunity;

(b)   The Rehabilitation Act of 1973 (29 USC 793), as amended, including 41 CFR Part 60-741 et seq., and 48 CFR 52.222-36, Affirmative Action for Workers With Disabilities;

(c)   The Vietnam Era Veterans Readjustment Assistance Act of 1974 (38 USC 4212), including 41 CFR Part 60-250 et seq. and 48 CFR 52.222-35, Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans;

(d)   The certification requirements for non-segregated facilities as ordered by the Secretary of Labor (32 F.R. 7439) and as required by 41 CFR Part 60-1 et seq.;

(e)   Executive Order 11141 (proscribing age discrimination);

(f)   The Service Contract Act of 1965, as amended (41 USC 351 et seq.) including 48 CFR 52.222-41;

(g)   48 CFR 52.237-7, Indemnification and Medical Liability Insurance;

(h)   48 CFR 219-8, Utilization of Small Business Concerns and 48 CFR 52.219-9, Small Business Subcontracting Plan (for subcontracts in excess of $500,000); and

(i)   All regulations, rules, orders, and applicable contract clauses promulgated under (a) through (h) above and/or required by federal, state, or local law, rule, or regulation to be included in this Agreement.

Agency agrees that until four years after payment under this Agreement Agency will afford the Secretary of Health and Human Services, Comptroller General of the United States or any of their duly authorized representatives, access to, and the right to examine, pertinent books, documents, papers and records of the successful bidder or offer or involving transactions relating to this Agreement.

10.   CONFIDENTIALITY AND PRIVACY
10.1.   Confidential Information. Subject to this Subsection 10.1, during the Contract Period and for two years from the expiration or termination of this Agreement, the parties shall hold Confidential Information confidential and shall not knowingly disclose Confidential Information to any third party.

10.2.   *Exclusions.* Confidential Information does not include information that:

(a)      Was known to the Receiving Party before receiving it pursuant to this Agreement and that knowledge can be documented;

(b)      is later obtained from a third party without an obligation of secrecy;

(c)      Becomes knowledge of the general public through no fault of the parties; or

(d)      is released from this provision by mutual agreement of the parties. In no event shall either party use Confidential Information except to perform this Agreement.

The Receiving Party may disclose Confidential Information when required by a court order. If required by a court order to disclose Confidential Information, the Receiving Party shall promptly notify the Disclosing Party of the need for the disclosure and give the Disclosing Party a reasonable time, if possible, to oppose the process. In addition, the Disclosing Party agrees that it will disclose only the minimum amount of Confidential Information required to comply with the court order. The confidential nature of Confidential Patient Information shall not expire.

10.3.   *Confidentiality of Protected Health Information; Privacy and Security Requirements.* The provisions applicable to privacy and security of patient health information are set forth in Schedule 11.3.

10.4.   *Certifications.* If Agencies employees have access to Confidential Information, those employees shall certify in writing that they understand and will comply with the confidentiality requirements of this Agreement.

11.   INDEMNIFICATION.

11.1.   *Definitions.* "Quest Diagnostics Indemnified Parties" are (i) Quest Diagnostics, (ii) its subsidiaries, affiliates and assignees, agents, and employees of Quest Diagnostics and its subsidiaries, affiliates and assignees, and (iii) all agents, employees, officers, and directors of Quest Diagnostics and its subsidiaries, affiliates and assignees. "Indemnified Amounts" are all losses, claims, damages, liabilities, penalties, actions, expenses, including reasonable attorneys' fees, judgments, costs, fines, settlements, disbursements, and other amounts.

11.2.   *General Indemnification Obligations.* Agency shall indemnify and hold the Quest Diagnostics Indemnified Parties harmless from and against any Indemnified Amounts arising from claims, demands, actions, suits, or proceedings whether civil, criminal, administrative, or investigative, in which Quest Diagnostics Indemnified Party may be involved, or threatened to be involved, as a party, resulting from or relating to the Services or this Agreement or any acts or omissions, or alleged acts or omissions of Agency or its employees, officers, directors, and/or agents involving negligence or misconduct arising out of or relating to the Services or this Agreement ("Actions"). Agencies Indemnification Obligations includes its obligation to indemnify and hold Quest Diagnostics Indemnified Parties harmless from and against Indemnified Amounts related to Agencies failure to pay its tax obligations under Subsection 5.2.

11.3.   *Intellectual Property.* Agency shall indemnify, defend, and hold Quest Diagnostics Indemnified Parties harmless from and against all Indemnified Amounts arising out of the infringement (or any claim of infringement) of any third party's intellectual property rights (including patents, copyrights, trademarks, and trade secrets) in any of the Services ("Infringement Action"). Quest Diagnostics agrees to cooperate reasonably with Agency in defense of the Infringement Action and grants Agency authority to defend or settle the Infringement Action. A Quest Diagnostics Indemnified Party may, at its sole cost and expense, engage counsel in the event of an Infringement Action. If commercially reasonable, Agency shall, at its sole cost, obtain any rights necessary to enable Quest Diagnostics to continue to use the Services, modify the Services to make them non-infringing and continue to meet the required specifications, or if either of these remedies is not available, replace the Services, if practicable. If none of these options is available, Agency shall provide a refund to Quest Diagnostics for all monies paid for the infringing Services.

11.4.   *Conditions.* As a condition to this obligation to indemnify, Quest Diagnostics shall give Agency prompt notice of any Action or any Infringement Action giving rise to this obligation and shall cooperate with Agency in its defense or settlement of the Action or any Infringement Action. Agency shall not be obligated to defend, indemnify, or hold the Quest Diagnostics Indemnified Parties harmless from any Action or any Infringement Action arising from the Quest Diagnostics Indemnified Parties' negligence or willful misconduct. Agency shall not settle any Action or any Infringement Action without Quest Diagnostics' prior written consent. Quest Diagnostics' failure to provide Agency with prompt notice, in writing, of an Action or Infringement Action shall not discharge Agencies indemnification obligations unless the failure or delay in providing Agency with notice materially prejudices Agencies ability to defend the Action or Infringement Action.

12.   INSURANCE.
Agency shall, during the Contract Period and for twelve months afterwards, maintain the types and levels of insurance sufficient to cover Agencies obligations under this Agreement, but not less than $1,000,000 per occurrence and $3,000,000 in the

aggregate to cover its acts and omissions and the acts and omissions of its employees and representatives under this Agreement. If the insurance is carried on a claims-made basis, Agency shall maintain the insurance for so long as claims may be legally made with respect to occurrences during the Contract Period.

**13.   ACCOUNTING AND AUDIT**

13.1.   *Collection Amounts Reconciliation.* Quest Diagnostics will reconcile accounts recovered against accounts placed and fees charged for collection services. Agency will submit full collection reconciliation on a monthly basis that will include both gross and net recoveries, fees withheld, adjustments and contingency percentage.

13.2.   *Records.* Agency shall maintain complete and accurate books and records relative to Agency performing the Services, including reconciliation reports, instructions, plans, receipts, statements, vouchers, and all manifests and any other records or reports required under Applicable Laws ("Records"), in accordance with generally accepted accounting principles, to substantiate Agencies chargeable time and expenses under this Agreement. Agency shall maintain the Records in accordance with accepted industry information storage practices and record retention periods applicable Agencies business and the health care industry, in compliance with Applicable Laws, and in accordance with sound accounting practices, consistently applied.

13.3.   *Independent Auditors/Discrepancies.* Agency will, at Quest Diagnostics' reasonable written request, make available to Quest Diagnostics the appropriate documentation reasonably necessary to verify that the fees that Agency charged the Quest Diagnostics Entities over the past year and that the calculation of fees are accurate and in compliance with the provisions of this Agreement.

**14.   MISCELLANEOUS**

14.1.   *Notices.* Any notices or communications required or contemplated by this Agreement must be in writing and sent, properly addressed to the other party at its addresses listed below. Notice shall be deemed effective upon delivery. Notices must be sent as follows:

(a)   Next-day delivery by a nationally recognized overnight delivery service such as Federal Express; or

(b)   Certified or registered mail, postage prepaid, return receipt requested.

| To Quest Diagnostics: | Nick Prosperi<br>1201 S. Collegeville Rd.<br>Collegeville, PA 19426 |
|---|---|
| With a copy to: | Ralph Breindel<br>2750 Monroe Blvd.<br>Norristown, PA  19403 |
| To Agency: | 400 Rouser Road<br>Suite 202<br>Moon Twp, PA 15108<br>Attention: Richard Briggs |

14.2.   *Dispute Resolution/Governing Law.* Any dispute, controversy, or claim ("Dispute") between the Parties arising out of or under this Agreement or its performance shall be resolved as set forth in this Subsection. The Parties shall use commercially reasonable efforts to resolve any Dispute and to reach a fair and equitable resolution.

(a)   Except in cases where a Party is seeking immediate injunctive relief, before either Party files suit, the Party must send written notice of the Dispute to the other Party. Each Party shall designate an individual who shall have the authority to resolve the Dispute ("Designated Contacts"). The Designated Contacts shall meet in person to resolve the Dispute. This meeting shall occur within ten Business Days after either Party asks, in writing, to escalate the matter to the Designated Contacts. If the Designated Contacts do not reach an agreement on how to resolve the Dispute within ten Business Days after meeting for the first time, the Parties may either establish another deadline or either Party may seek to resolve the Dispute as provided in this Subsection.

(b)   Any Dispute will be resolved exclusively in the state or federal courts of New Jersey. Each of the Parties hereby expressly submits to the personal jurisdiction of the foregoing courts located in New Jersey and waives any objection or defense based on personal jurisdiction or venue that might otherwise be asserted in proceedings in those courts. THE PARTIES ALSO HEREBY IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO OR ARISING FROM THIS AGREEMENT. Except as provided in Section 17 (Indemnification), in any litigation, each Party shall bear its own fees and expenses, including attorneys' fees. Each Party represents that it has reviewed this waiver and knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. If there is litigation, either Party may file a copy of this Agreement as a written consent to a trial by the court.

(c)      The laws of the State of New Jersey (without giving effect to its conflict of law principles) will govern all matters arising out of or relating to this Agreement and all the transactions it contemplates, including its validity, interpretation, construction, performance, and enforcement. Agency submits to the jurisdiction of the federal and state courts located in New Jersey.

(d)      Each Party may seek from any court having jurisdiction any interim or provisional relief necessary to protect that Party's rights or property. By doing so, that Party does not waive any right or remedy under this Agreement. Any interim or provisional relief will remain in effect until the Dispute is resolved.

14.3.     *Use Of Marks and Press Releases.* Neither party shall use the name, insignia, symbol, trademark, trade name, or logotype of the other party (or any abbreviation or adaptation thereof) in any publication, press release, promotional material, or other form of publicity without the prior written approval of the other party. The restrictions imposed by this Subsection shall not prohibit either party from making any disclosure identifying the other party that is required by Applicable Law or contemplated by this Agreement. Except as otherwise required by Applicable Law, the Parties shall not and shall not permit their respective affiliates to issue or cause the publication of any press release or make any other public announcement with respect to this Agreement, without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed. The Parties agree to cooperate in the preparation of all public announcements related to this Agreement, if any, and shall furnish drafts of any releases and announcements to the other Party within a reasonable time prior to their proposed release.

14.4.     *Survival.* In addition to any provisions that by their nature are intended to survive termination, the provisions of Subsections 1.3, 2.3, 7.1, 14.6, 14.7, 14.11, and 14.15 and Sections 10, 11, 12, 13, and 14 shall survive termination of this Agreement.

14.5.     *Independent Contractors.* Quest Diagnostics and Agency are independent contractors engaged in the operation of their own respective businesses. Neither party is the agent or employee of the other party for any purposes. Neither party has authority to enter into contracts or assume any obligations for or on behalf of the other party or to make any warranties or representations for or on behalf of the other party.

14.6.     *Severability.* The parties intend that this Agreement will be enforceable under Applicable Laws. If a court of law or arbitral panel holds any provision of this Agreement unenforceable, all other provisions of this Agreement will remain in effect. If a court of law or arbitral panel holds a provision of this Agreement unenforceable in part, the Agreement will remain in effect to the extent that it is not held unenforceable. To the extent possible, the parties will amend this Agreement to modify any unenforceable provision to render it valid and enforceable.

14.7.     *Assignment.* Neither party may assign any of its rights under this Agreement, except that Quest Diagnostics may assign this Agreement in its entirety to a successor or parent corporation, upon written notice to Agency. All other assignments of rights are prohibited under this Subsection, whether they are voluntary or involuntary, by merger, consolidation, dissolution, operation of law, or any other manner. For purposes of this Subsection, a "merger" refers to any merger in which a party participates, regardless of whether it is the surviving or disappearing corporation. No party may delegate any performance under this Agreement. Any purported assignment of rights or delegation of performance in violation of this Subsection is void.

14.8.     *Force Majeure.* If a Force Majeure Event occurs, the Non-Performing Party is excused from whatever performance is prevented by the *Force Majeure* Event, but only to the extent prevented by the *Force Majeure* Event. When the Non-Performing Party is able to resume performing its obligations under this Agreement, it shall immediately give the other party written notice to that effect and shall resume performing its obligations under this Agreement no later than two business days after sending the notice. If the Force Majeure Event extends beyond 30 days, Quest Diagnostics shall have the right to terminate this Agreement, without penalty, upon written notice to Agency. Further, during Agencies excused period of non-performance, Quest Diagnostics may, without penalty, procure replacement Services, as needed, from other vendors.

14.9.     *Participation in Federally Funded Healthcare Programs.* Each party to this Agreement represents that it (a) has not been convicted of a criminal offense related to health care and (b) is not currently listed by a federal agency as debarred, excluded, or ineligible to participate in federally funded health care programs. A party shall notify the other party in writing within five days after any change in this representation or if circumstances change to render this representation false during the Contract Period. Any change in circumstances shall constitute cause by the other party to immediately terminate this Agreement. For purposes of this Subsection, the terms "Quest Diagnostics" and "Agency" each includes the entity entering into this Agreement and the entity's parent, principals, shareholders, directors, and officers and any employees or agents of that entity.

14.10.     *Entire Agreement.* This Agreement, including all attachments, constitutes the entire Agreement between the parties concerning its subject matter and supersedes all prior written or oral agreements or understandings between the parties with respect to the subject matter of this Agreement. No modification to this Agreement will have any force or effect unless the modification is in writing and signed by authorized representatives of both parties.

14.11.   *Waiver/Remedies.* No waiver of any breach or failure by either Party to enforce any of the terms or conditions of this Agreement will limit or waive the Party's right to enforce and to compel strict compliance with every term and condition nor will it constitute a waiver by the Party of its rights in equity or under Applicable Law. The rights and remedies provided in this Agreement shall be cumulative and be in addition to other rights and remedies available to the Parties in law and equity.

14.12.   *Counterparts.* This Agreement may be executed in one or more counterparts, including by facsimile, all of which shall be considered one and the same agreement. The Agreement shall become effective when each party has signed and delivered to the other party at least one such counterpart.

14.13.   *Prohibition Against Gifts.*
(a)       Agency may not offer gifts or other items of value including cash, free goods, merchandise, tickets to sporting or entertainment events, special discounts, honoraria, liquor, food products, personal services, preferential treatment, reimbursement or payment for travel expenses, lodging, or meals to Quest Diagnostics employees, representatives, officers, or directors or to their family members ("Gifts"). Promotional items or items of minimal value such as pens, caps, mugs, and t-shirts are not considered Gifts.

(b)       Compliance with this provision is a condition of doing business with Quest Diagnostics. If Agency does not comply with the requirements of this provision, Quest Diagnostics may consider it a material breach of this Agreement regardless of whether the Quest Diagnostics employee accepted the gift or benefit. If Agency breaches the requirements of this Subsection, Agency shall have thirty days to cure the breach after receiving notice from Quest Diagnostics describing the incident. After this thirty-day period, if Agency has not cured the breach, or if the breach is not capable of being cured, Quest Diagnostics shall have the right to terminate this Agreement and any other agreements it has with Agency.

(c)       Agency agrees to cooperate with Quest Diagnostics in investigating any incident in which a Quest Diagnostics employee accepted a Gift offered by Agencies employee. Agencies cooperation would include making the employee, who made the offer available to Quest Diagnostics, under agreed upon terms and conditions, to answer questions about the incident.

14.14.   *Amendment.* No amendment to this Agreement shall be effective unless it is in writing and signed by the Parties. Agency and Quest Diagnostics agree to amend this Agreement in any manner reasonably necessary either to comply with or address the impact of any amendment of any Applicable Law or any applicable court decision, or binding governmental policy or opinion.

14.15.   *Other Provisions.* Except where the context requires otherwise, whenever used the singular includes the plural, the plural includes the singular, and the term "including" or "includes" means including, without limiting the generality of any description preceding that term. When this Agreement refers to a number of days, unless otherwise specified as business days, that reference is to calendar days. The headings in this Agreement are provided for convenience only and do not affect the Agreement's meaning. The wording of this Agreement shall be deemed wording mutually chosen by the Parties and no rule of strict construction shall be applied against either Party. Any reference in this Agreement to a section, article, schedule, or exhibit is to a section, article, schedule, or exhibit of this Agreement. Unless specified otherwise, any reference to a statute means that statute and any successor statute and regulations promulgated under it, all as amended or supplemented from time to time. To the extent the provisions of this Agreement and any Schedule or exhibit conflict, the provisions of this Agreement supersede and control.

IN WITNESS WHEREOF, the parties intending to be legally bound, execute this Agreement and represent that the individuals executing this Agreement have authority to bind the respective entities.

NATIONAL ASSET MANAGEMENT, LLC                 QUEST DIAGNOSTICS INCORPORATED

By: _____                    By: _____
Print Name: Richard Beckles                     Print Name: William P. Burg
Title: President / CEO                           Title: V.P. Corporate Procurement
Date: 11.5.07                                    Date: 11/2/07

## Schedule 3.1
### Services and Fees

**A.**   **Patient Services Schedule**
Agency Warrants that it will:

a. Get advance written approval from Quest Diagnostics of all changes to call scripts and letters
b. Get advance written approval from Quest Diagnostics before implementing any changes to Agencies collection practices
c. Not collect anything less than the full amount billed. Settlement options will not be offered.
d. Not report patients or accounts to credit agencies unless authorized to do so in writing by Quest Diagnostics.
e. Meet the minimum set of collection standards (Defined in Schedule 8.1)
f. Furnish internal training and quality SOP's to Quest personnel upon request
g. Reference Quest Diagnostics as the service provider, "date of service" and Quest Diagnostics invoice number
h. Track and communicate call center metrics for patients and Quest Diagnostics inquiries (as defined in Schedule 8.1)
i. Provide certified translation services for letters or calls
j. Support a standardized reporting format as required by Quest Diagnostics, communicated by portal or electronic distribution.
k. Submit HCPA's to insurers on Quest Diagnostics behalf
l. Disclose available call center staff capacity prior to enabling new sites
m. Meet FDCPA (Fair Debt Collection Practices Act) Act
n. Meet Nevada local presence requirement within three months of contract execution
o. Have "Scan Line" remit and "Fast Forward" capabilities
p. Identify bankrupt accounts to avoid inappropriate contact
q. Communicate new patient address and insurance information in electronic format as it becomes available
r. Pursue Workers Comp collections accounts within three months of contract execution

**B.**   **Payroll/Human Resources Services Schedule**
Provide an initial notification via letter in compliance with Quest Diagnostics and the FDCPA. (No phone calls)
After 30 days update the credit bureau files (Equifax, Experian, Transunion and Innovis) with the delinquency.
Accept and process payments, payment plans upon contact from consumer (former employee).
Remit reports and payments to Quest Diagnostics.

**C.**   **Agencies Scheduled Holidays**

a. Memorial Day
b. Independence Day
c. Labor Day
d. Thanksgiving Day
e. Christmas Day

## Schedule 3.5
## System Security Requirements

(a)   Requirements Supplier must meet before a system, including instrumentation, is attached to the Quest Diagnostics network:

    (i)   Windows-based systems have Quest Diagnostics' standard anti-virus software, anti-virus policy management, and SMS and/or Altiris CMS client installed.

    (ii)   All systems must use a supported version of Supplier's operating system for which security patches are actively developed.

(b)   Requirements that Supplier must meet before systems that host Quest Diagnostics data in an outsourced environment go into production:

    (i)   All systems must use a supported version of Supplier's operating system for which security patches are actively developed.

    (ii)   Outsourced systems must have tools and processes in place to keep systems at current anti-virus and patch levels.

(c)   Requirements that Supplier must meet before an application goes into production:

    (i)   Both the application and supporting infrastructure must comply with Quest Diagnostics' Corporate Security technical security standards set forth in Exhibit C.

    (ii)   For Internet applications, an external security assessment will be performed, high-risk items will be remedied, and an approved remediation plan for other items will be put in place.

Exhibit A

**Sliding Scale Compensation Model**



| Recovery Rate | Contingency Fee |
|---|---|
| < 15.1% | 5.0% |
| 15.1% - 17.0% | 16.0% |
| 17.1% - 19.0% | 17.5% |
| 19.1% - 21.0% | 18.5% |
| 21.1% - 23.0% | 20.0% |
| 23.1% - 25.0% | 21.5% |
| > 25.0% | 23.0% |

- Recovery rate formula is based on total dollars recovered as a percentage of gross placements
- Quest Diagnostics sites may opt out of the sliding scale and pay a flat (16% or 17%) contingency fee
- Net placements will be determined by subtracting allowable adjustments from Gross placements
- Allowable Adjustments:
  - Bankruptcy
  - Deceased Patient
  - Quest Diagnostics directed return of accounts (Legal)
  - Quest Diagnostics directed non-cash balance adjustments (Insurance re-pricing)
- Sliding Scale applies to primary placements, unless Business Unit has elected the flat (16% or 17%) contingency fee option
- Recovery rates and sliding scale fees will be tracked and paid at the Business Unit level.
- Secondary placements will carry a contingency fee of 35%
- Recovery rates will be grouped by all primary placements by Business Unit with each Agency during a month

**Payroll/Human Resources Compensation Schedule**

- Agency will utilize the "Net Remittance" method of obtaining fees. The net remittance method implies that the Agency will submit payment to Quest Diagnostics for amounts collected from employees after Agency has deducted a 10% contingency fee.

Schedule 8.1
Service Levels

| Service Obligation | Definitions | Measure | Performance Target |
|---|---|---|---|
| Seller's Problem Resolution Response Turnaround Time | Agency's response time minus the time of the original Quest Diagnostics problem resolution request. | Actual response time. | Shall not exceed two hours, when requested by Quest Diagnostics before 5:00 pm Eastern Time. |
| Accuracy | First call resolution, Agency's ability to resolve Patient issues the first time | Actual resolution rate. | Error rate of 91% or better, with all issues resolved and appropriate actions taken in 3 days or less. |
| Quality | Timeframe for posting placements | Date posted minus date placed | 3 days or less |
| Timeliness | How fast do calls get answered? | ASA - Average Speed of Answer | <30 Seconds as measured in any monthly period |
| Timeliness | Recovery Rate within the first 90 days | Early Recovery | >69% within the first 90 days after placement |
| Reports | Agency's responsibility to keep reporting current | Report Refresh/Availability | Availability 24/7 Refreshed on Monday every week |
| Minimum Collection Standards | Agency's minimum collection effort | Phone Calls | Upon placements all accounts will be loaded into NARM's predictive dialer(s). Initial attempted contact will be made on each account within the first 24 hours of assignment. |
| Minimum Collection Standards | Agency's minimum collection effort | Letters | In accordance with the FDCPA each account assigned to NARM will receive an initial notification within 5 days of assignments. |

### EXHIBIT B
### REQUEST FOR SERVICES FORM

This Request For Services, effective as of _____, 200__ ("Effective Date"), is between Quest Diagnostics [Entity] [«NAME»] located at _____ ("Quest Diagnostics") and Seller.

The parties have entered into an Agreement to Purchase Equipment, Reagents, and Supplies dated as of _____, 2005 ("Purchase Agreement"). In that Purchase Agreement, Seller agreed to provide Services to Quest Diagnostics for Scheduled Equipment. Quest Diagnostics wishes to obtain Services for the Schedule Equipment located at _____ _____ beginning on _____, 200__ ("Service Start Date").

1.   The terms of the Purchase Agreement shall govern this Request for Services. If the terms of this Request for Services are inconsistent with the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control unless this Request for Services particularly references the inconsistent provision in the Purchase Agreement and explicitly states that the provision in this Request for Services govern. Any term not defined in this Request for Services shall have the same meaning as in the Purchase Agreement.

2.   Seller shall provide Services pursuant to the Purchase Agreement at the Quest Diagnostics Location, beginning on the Service Start Date or on any other date that the parties may agree for the Scheduled Equipment listed on Attachment I, which may be amended from time to time upon the agreement of the parties.

AGREED AND ACCEPTED:

NATIONAL ASSET MANAGEMENT, LLC                    QUEST DIAGNOSTICS [ENTITY]

By: _____              By: _____
        (Authorized Signature)                            (Authorized Signature)
Name: _____               Name: _____
Title: _____              Title: _____
Date: _____               Date: _____

## Schedule 11.3
### Protected Health Information; Privacy; Security Requirements.

1. *Definitions.* "HIPAA" means the Health Insurance Portability and Accountability Act of 1996. The terms *"Privacy Regulations"* and *"Security Regulations"* refer to the regulations issued pursuant to HIPAA and applicable to the privacy or the security of individually identifiable health information. All other terms used, but not otherwise defined in this Agreement, shall have the same meaning as those terms defined in the Code of Federal Regulations applicable to HIPAA.

2. *Privacy.* Quest Diagnostics will disclose to Agency and Agency will use, disclose, or create Protected Health Information ("PHI") on behalf of Quest Diagnostics for Treatment, Payment, or Health Care Operations purposes and for the specific purposes specified in this Agreement. Agency agree that it will not to use or further disclose any PHI or individually identifiable Health Information received from Quest Diagnostics or created by Agency other than as permitted by this Agreement or as required by applicable law or regulations. Agency will use or disclose only the Minimum Necessary PHI to accomplish the intended purpose of its use or disclosure and will implement appropriate safeguards to prevent the use or disclosure of PHI other than as provided for by this Agreement or in accordance with law.

3. *Access to PHI.* Agency will provide access to PHI upon Quest Diagnostics' request, will make amendments to PHI as Quest Diagnostics directs, and will maintain a record of disclosures of PHI as Quest Diagnostics requires to make an accounting to the individual as required by the Privacy Regulations.

4. *Reports.* Agency will promptly report to Quest Diagnostics any use or disclosure of PHI not provided for by this Agreement or any security incident (as that term is defined in the Security Regulations) of which Agency become aware.

5. *Subcontractors.* If Agency, with Quest Diagnostics' approval, contracts with sub-contractors or agents in connection with this Agreement and provides them with PHI, Agency shall include provisions in Agencies agreements whereby Agencies sub-contractor or agent agrees to the same privacy and security requirements and restrictions and conditions that apply to Agency with respect to PHI.

6. *Records Relating to Use and Disclosure of PHI.* Agency will make Agencies internal practices, books, and records relating to the use and disclosure of PHI available to the Secretary of Health and Human Services and to Quest Diagnostics to the extent required for determining compliance with this Agreement, the Privacy Regulations, and the Security Regulations. Notwithstanding the foregoing, no legal privilege shall be deemed waived by Agency or Quest Diagnostics by virtue of this Section of this Agreement.

7. *Termination.* Quest Diagnostics may terminate this Agreement without penalty or recourse if Quest Diagnostics determines that Agency have violated a material term of this Agreement relating to privacy or security of PHI or applicable law that is not cured within thirty calendar days after delivery of the notice of violation to Agency. In lieu of termination, Quest Diagnostics, in its sole discretion, may report the breach to the Secretary. Upon termination of this Agreement for any reason, Agency and Agencies contractors or agents agree to return or to destroy all PHI and retain no copies (and to certify to those nations) unless otherwise agreed by Quest Diagnostics. If Quest Diagnostics agrees, Agency will extend the protections of this Agreement to the PHI that Agency maintain and limit further uses and disclosures of the PHI to the purposes that make the return or destruction of the PHI not feasible.

## Exhibit C
### Application Service Provider Security Standard

Note: This standard applies only to applications that are provided by an ASP (see definition below) and maintains Internal, Confidential or Quest Diagnostics branded data. This standard does not address hosting arrangements where a Quest Diagnostics owned application is hosted by a third party or Quest Diagnostics' servers are co-located at a third party host.

# Network Security

| IS-ASP-NS-01 | The application must display the below information to a Quest Diagnostics user upon the initiation of an interactive session with the application: <br> (1) Unauthorized access to the application is prohibited <br> (2) Quest Diagnostics' Security Policy provides for the monitoring, collecting and recording of all activity on this computing resource <br> (3) Any unauthorized activity observed could be subject to temporary or permanent access restrictions as well as disciplinary action up to and including termination <br> The legal department must approve the specific language. |
|---|---|
| IS-ASP-NS-02 | Quest Diagnostics instances of business applications must only be accessible to Quest Diagnostics employees that are originating their communications from a Quest Diagnostics network. Direct access to the application from the Internet or any other network is not permitted. |
| IS-ASP-NS-03 | For applications that are accessed from the Internet, or any other public network, the hosted application must: <br> (1) Enforce mandatory 128-bit SSLv3 encryption for all activities. <br> (2) Be accessible only via a web browser via traditional web services ports. |
| IS-ASP-NS-04 | The application must reside behind a network firewall allowing passage to only the services required to access the application. |

# User Security

| IS-ASP-US-01 | The application must mandate the creation and use of unique user id. |
|---|---|
| IS-ASP-US-02 | The application must periodically enforce the expiration of a user's password no less frequently than every 90 days. |
| IS-ASP-US-03 | The application must notify the user in advance of the user's password expiring. |
| IS-ASP-US-04 | The application must not display passwords being entered. |
| IS-ASP-US-05 | The application must store user passwords in a one-way encrypted format so that passwords cannot be recovered. |
| IS-ASP-US-06 | The application must enforce minimum password strength requirements to include: <br> (1) The password must be at least 8 characters in length <br> (2) The password must contain at least one alphabetic and one numeric or special character <br> (3) The password must not equal the user id <br> (4) The password must be case sensitive |
| IS-ASP-US-07 | The application must enforce a password change upon the first successful login: <br> (1) By a new user <br> (2) After a password reset <br> (3) After a password has expired |
| IS-ASP-US-08 | For password changes, the application must require the user to provide current credentials. |
| IS-ASP-US-09 | The application must never convey the reason for a login failure, only that the login failed. |
| IS-ASP-US-10 | After no more than five (5) consecutive login failures, the application must automatically disable a user account so that a security administrator must reset it. |
| IS-ASP-US-11 | The application must terminate interactive sessions after a period of inactivity not to exceed thirty (30) minutes. |
| IS-ASP-US-12 | The application must maintain an audit log of the following user access events: <br> (1) Successfully authenticated sessions including the user id and the login/logout times <br> (2) Failed authentication attempts <br> (3) Account lockouts due to too many consecutive failed logins |

# Contract Requirements

| | |
|---|---|
| IS-ASP-CR-01 | All Quest Diagnostics data that resides in a hosted data store or on a hosted server, whether original or derived in whole or in part from original Quest Diagnostics data must remain the property of Quest Diagnostics and may not be used in any way not explicitly agreed to by Quest Diagnostics. |
| IS-ASP-CR-02 | If the data that resides at the ASP is the original/only copy of the data, then the ASP must periodically provide Quest Diagnostics a copy of the data. In the event that a particular application is required to view the data, the ASP must furnish a copy of the application. |
| IS-ASP-CR-03 | The ASP must agree to abide by Quest Diagnostics' Media Disposal (IS-STD-DISPOSAL) and Reuse (IS-STD-REUSE) security standards for all media that may reasonably be expected to house Quest Diagnostics' data. |
| IS-ASP-CR-04 | The ASP must agree to abide by Quest Diagnostics' records retention policies for all records related to the operation of the application. |
| IS-ASP-CR-05 | The ASP must agree to report any actual or suspected breach of its security controls that discloses or is suspected of disclosing any Quest Diagnostics' data within a period of time agreed to in writing. |
| IS-ASP-CR-06 | After a pre-production readiness assessment, the ASP must submit to a security evaluation of the application by a third party security firm of Quest Diagnostics' choosing. A satisfactory outcome for the assessment must be a requirement for successfully meeting the terms of the contract. In the event of a significant failure identified by the third party, the successful remediation of the failure along with a re-evaluation by a third party must be a requirement for meeting the terms of the contract. |
| IS-ASP-CR-07 | Production data may not be placed on the ASP systems until the requirements of IS-ASP-CR-05 are successful satisfied. |
| IS-ASP-CR-08 | The application must be periodically re-evaluated:<br>(1) After major upgrades to the application<br>(2) Not less frequently than once a year |
| IS-ASP-CR-09 | If the ASP chooses to contract for its own security evaluations, the results of such evaluations must be made available for review by Quest Diagnostics.<br>The ASP must agree to comply with all legislative or licensing requirements that may apply to the use of the application by Quest Diagnostics. |
| IS-ASP-CR-10 | The ASP must agree to submit to audits by Quest Diagnostics, Quest Diagnostics' representatives or outside organizations that are responsible for determining compliance with legislative and licensing requirements as identified in IS-ASP-CR-06. |

# Security Administration

| | |
|---|---|
| IS-ASP-SA-01 | The application must support the following independent roles that can be granted to Quest Diagnostics' security administrators:<br>(1) Grant security administration privileges<br>(2) Grant user privileges based upon roles |
| IS-ASP-SA-02 | Quest Diagnostics security administrators must have the ability to add, delete, modify and disable user accounts on the application belonging to Quest Diagnostics employees. |
| IS-ASP-SA-03 | The hosted must allow for users to select and change their passwords at will. |
| IS-ASP-SA-04 | The application must not allow security administration functions to be accessed from untrusted networks. |
| IS-ASP-SA-05 | The application must allow a security administrator to set a user password to a unique value. |
| IS-ASP-SA-06 | The application must allow a security administrator to expire a user password thus forcing a password change on next login. |
| IS-ASP-SA-07 | The application must allow a security administrator to specify a future date for the automatic disabling of a user's access privileges. |
| IS-ASP-SA-08 | The application must provide for the automatic disabling of accounts that remain unused for a period of time not to exceed 90 days. |

iii

| IS-ASP-SA-09 | The application must provide tools that allow a security administrator to:<br>(1) Get an inventory of all current registered users<br>(2) Detail privileges assigned to each user<br>(3) List all user login activity |
|---|---|
| IS-ASP-SA-10 | The application must maintain an audit log of the following security administration events:<br>(1) The addition or removal of a user account<br>(2) The addition or removal of a group<br>(3) The change in privileges assigned to a user or group<br>(4) The disabling of an account<br>(5) Password resets |

Glossary

| Term | Definition |
|------|-----------|
| Application Service Provider (ASP) | A third-party entity that manages and distributes software-based services and solutions to customers across a wide area network from a central data center. |

Related Documents

| Document Title | Description |
|----------------|-------------|
| IS-STD-DISPOSAL | Media Disposal Security Standard |
| IS-STD-REUSE | Media Reuse Security Standard |
| | Records Retention Schedule |

Revisions

| Version | Date | Revision | Submitted by |
|---------|------|----------|--------------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Effective this date, this standard shall be referenced in replacement of all previous revisions.

| NAME | Gail Glover |
|------|-------------|
| TITLE | Director, Security Policy, Administration and HIPAA |
| SIGNATURE | |
| DATE | 1/1/2004 |

# EXHIBIT B

## AMENDMENT TO SERVICES AGREEMENT

This AMENDMENT ("Amendment") to the SERVICES AGREEMENT between Quest Diagnostics Incorporated with offices at 3 Giralda Farms, Madison NJ 07940 ("Quest Diagnostics") and National Asset Management, LLC, a Pennsylvania corporation having offices at 400 Rouser Road, Suite 202, Moon Township, PA 15108 ("Agency") is effective November 1, 2010 ("Amendment Effective Date"). Quest Diagnostics and Seller are each a "Party" and collectively "Parties."

### RECITALS:

The Parties executed a Services Agreement effective November 1, 2007. By this Amendment, the Parties desire to amend the Agreement to modify language. In consideration of the mutual covenants and agreements contained in this Amendment, the Parties hereby amend the Agreement to;

1. Add Payment Card Industry language to Section 9 so that Section 9.3 reads as follows:

   *Payment Card Industry.* Agency will maintain internal audit controls to adhere to and continuously monitor for compliance specific to the Payment Card Industry Standards for the duration of the contract. Agency will provide a copy of the ROC completed by the quality security accessor. Agency will conduct a baseline audit of its internal controls, data processing systems used to provide services, system security and business continuity programs annually using an approved auditor from the Payment Card Industry Approved Auditor network. Agency agrees to define an action plan to review and evaluate recommendations made by the auditor within a period of 30 days from the publication of the report from the auditor and to address mutually agreed upon gaps as citied within 60 days from the publication of the auditor's report.

2. Add a new fee structure to Exhibit A, so that it reads as follows:

| Proposed Sliding Scale Fee Schedule | |
|---|---|
| Recovery % | Fee % |
| <13% | 15.0% |
| 13.0-14.99% | 15.5% |
| 15.0-16.99% | 16.0% |
| 17-20.99% | 17.75% |
| 21.0-23.99% | 19.5% |
| >24.0 | 20.0% |

3. All other terms contained in the Agreement not specifically modified by this Amendment shall remain in full force and effect.

The Parties executed and agreed to this Amendment as of the Amendment Effective Date.

NATIONAL ASSET MANAGEMENT

By: _____

Name: Richard Brichas.

Title: President.

Date: 12-7-2010.

QUEST DIAGNOSTICS INCORPORATED

By: _____

Name: William J. Borg

Title: VP, Procurement

Date: 12/6/10

# EXHIBIT C

CW1979691

## AMENDMENT TWO TO SERVICES AGREEMENT

This AMENDMENT TWO to the Services Agreement ("Amendment Two"), effective as of the 1st day of November, 2013 ("Amendment Effective Date") is entered into by and between Quest Diagnostics Incorporated ("Quest Diagnostics") and National Asset Management ("Agency") and amends the existing Services Agreement.

**WITNESSETH:**

**WHEREAS,** Quest Diagnostics and Agency entered into a certain Services Agreement dated November 2, 2007 ("Agreement") and further Amended on November 1, 2010 ("Amendment") which is incorporated herein by reference; and

**WHEREAS,** Quest Diagnostics and Agency wish to extend the term of the Agreement;

**NOW, THEREFORE,** in consideration of the mutual promises hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      The term of the Agreement shall be extended from November 1, 2013 until February 28, 2014.

All other terms of the Agreement, including the Attachment(s) thereto, not specifically modified by this Amendment, remain in full force and effect. In the event of a conflict between the terms of this Amendment and the Agreement, the terms of this Amendment shall prevail.

QUEST DIAGNOSTICS INCORPORATED

By: _____

Print Name: _Brian W. Bartan._

Title: _BAS Portfolio Dir._

Date: _10-30-2013_

NATIONAL ASSET MANAGEMENT

By: _____

Print Name: _Richard Briggs_

Title: _Managing Member_

Date: _10.27.2013_

1

# EXHIBIT D

# Jenyce M. Woodruff, Esq.

410 Rouser Road
Suite 105
Moon Twp, PA 15108
Phone: (412) 424-8958
Fax: (412) 424-0259
JWoodruff@eight-fold.com

January 1, 2014

VIA FIRST CLASS AND CERTIFIED MAIL R.R.R. ONLY
Quest Diagnostics Incorporated
Attn: Nick Prosperi
1201 S. Collegeville Rd
Collegeville, PA 19426

RE:   National Asset Management, LLC and Quest Diagnostics Incorporated
(hereinafter "Quest")
Services Agreement

Dear Mr. Prosperi:

Please be advised that I am acting legal counsel for National Asset Management, LLC
(hereinafter "NAM"). This correspondence shall serve as notice of termination of the Services
Agreement dated as of November 2, 2007 and amended from time to time (hereinafter the
"Agreement") between NAM and Quest. NAM is no longer be able to perform the services as
provided by the Agreement. It is with deep regret that NAM must end this mutually beneficial
relationship with Quest as it has certainly been a pleasure to work with such a fine company over
the years.

According to industry standards, NAM certifies that any and all Protected Health Information
will be properly destroyed.

Please be aware that due to NAM winding down initiatives, it has been discovered that Quest
withdrew a multitude of patient debtor accounts that were set to be paid by the insurance without
remitting the proper commission payment to NAM. NAM is in the process of performing an
internal audit to ascertain the exact amount owed by Quest and will provide notice and a final
invoice accordingly. To that end, NAM respectfully requests that Quest perform an internal
audit and provide NAM with direct payment and insurance payment records from the inception
of the Agreement to the present date. Please also be advised that all future ACH payments will
be held in escrow until a proper accounting can be completed.

Sincerely Yours,

Jenyce M. Woodruff

cc:   National Asset Management, LLC
Ralph Breindel (2750 Monroe Blvd. Norristown, PA 19403)

# EXHIBIT E

**From:** Plocinik, Christopher J
**Sent:** Wednesday, January 08, 2014 8:14 AM
**To:** 'brian@nationalmanagement.com'
**Cc:** Breindel, Ralph J; 'jwoodruff@eight-fold.com'; Syz, Jing-Kai X
**Subject:** FW: Termination Letter

Brian, I understand you are acting COO of NAM.  We are requesting a meeting to assess and understand the situation.

Just to ensure you have been advised appropriately in regards to the Agreement please understand the following:

1.   NAM does not have the right to terminate for convenience and therefore you could be considered in breach of the agreement.
2.   You are responsible to fulfill specific obligations in the event were to terminate in accordance with the Agreement.
3.   The contract does not give you the right to withhold funds in Escrow for any reason.

Thanks,


**Christopher J. Plocinik**
**Quest Diagnostics** | Category Manager, Business Partner Services | 1201 S. Collegeville Road | Collegeville, PA 19426 USA
| **phone** +1.610.454.4637 | **fax** +1.610.983.2079 | **mobile** +1.610.308.6441 |
Christopher.J.Plocinik@QuestDiagnostics.com | QuestDiagnostics.com

Please think about resource conservation before you print this message

# EXHIBIT F

**From:** Breindel, Ralph J <Ralph.J.Breindel@questdiagnostics.com>
**Sent:** Tuesday, January 14, 2014 11:56 AM
**To:** Dr. Rickard Briggs, D.el
**Subject:** Trying to Contact You Again

Rickard, this e-mail is an attempt to contact you one more time regarding the NAM placements as well as the IAS placements. Please respond.

Ralph

Ralph J Breindel

Quest Diagnostics | Director, Cash/Bad Debt Solutions| Certified Six Sigma Black Belt | Revenue Services | 1001 Adams Blvd. | Norristown, PA 19403 USA | phone 484.676.7881 | fax 610.271.3484 | mobile 484.888.1027 | Ralph.J.Breindel@questdiagnostics.com | www.QuestDiagnostics.com |

| | |
|---|---|
| **From:** | Breindel, Ralph J <Ralph.J.Breindel@questdiagnostics.com> |
| **Sent:** | Tuesday, January 14, 2014 2:07 PM |
| **To:** | rbriggs@nationalmanagement.com |
| **Subject:** | Trying to Contact You |

Rickard, please call me or respond to my E-mail.  We are trying to understand what NAM has processed and what they haven't.

Ralph

Ralph J Breindel

Quest Diagnostics | Director, Cash/Bad Debt Solutions| Certified Six Sigma Black Belt | Revenue Services | 1001 Adams Blvd. | Norristown, PA 19403 USA | phone 484.676.7881 | fax 610.271.3484 | mobile 484.888.1027 | Ralph.J.Breindel@questdiagnostics.com | www.QuestDiagnostics.com |

1

# EXHIBIT G



DLA PIPER LLP (US)
51 John F. Kennedy Parkway, Suite 120
Short Hills, NJ   07078
www.dlapiper.com

Joseph D. Guarino
Joseph.guarino@dlapiper.com
T  973.520.2569
F  973.520.2576

Partners Responsible for Short Hills Office:
Andrew P. Gilbert
Michael E. Helmer

January 14, 2014
VIA U.S. MAIL AND EMAIL

Jenyce M. Woodruff, Esq.
Suite 105
Moon Twp, PA  15108

Re:   Services Agreement Between National Asset Management, LLC and Quest Diagnostics
      Incorporated.

Dear Ms. Woodruff:

We represent Quest Diagnostics Incorporated ("Quest") and we write in response to your letter dated
January 1, 2014.

Upon receiving your letter, representatives from Quest made numerous attempts to contact National
Asset Management, LLC ("NAM") to request that a meeting take place as required by Section 14.2(a) of
the parties' Services Agreement (the "Agreement"). Our client is entitled to a detailed explanation of
NAM's unilateral (and wrongful) termination of the Agreement and it has a right to safeguard its assets.
Incredibly, NAM has callously failed to respond in any way to Quest's efforts.

As you know, NAM is servicing approximately $89 million of Quest's receivables. NAM has no right
whatsoever - under the Agreement or otherwise - to hold hostage Quest's receivables or cash. Our client
views such conduct as a theft of property and will aggressively seek its return.

Accordingly, Quest hereby demands that NAM immediately: (1) stop all commercial activity on behalf of
the Company; (2) perform an accounting of the receivables and the amounts collected that have not yet
been paid to Quest; (3) advise as to the status of each and every account in the collection cycle process;
(4) assist in the transition of the accounts back to Quest; and (5) return all funds that have been collected
on behalf of Quest.

I expect to hear from you by the close of business tomorrow to confirm your client's agreement to comply
with the above demands. This letter does not intend to waive any rights or remedies that Quest has or
may have, all of which are hereby reserved and preserved.

Very truly yours,

DLA Piper LLP (US)

Joseph Guarino

Joseph D. Guarino